IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAMMY J. TITUS, | ) | CASE NO. 1:11CV1286 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Tammy J. Titus ("Titus") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42

U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title XVI of the

Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  For the

following reasons, the final decision of the Commissioner should be **AFFIRMED.**

## I.  Procedural History

Titus filed an application for DIB on June 15, 2004, and an application for SSI on June

17, 2005.  Tr. 94, 820, 903.  Titus claimed that she was disabled due to a combination of

impairments, including depression, back and neck pain, and arthritis.  Tr. 70, 77.  The state

agency denied Titus's claims initially and upon reconsideration, and Titus timely requested a

hearing.  Tr. 61, 64-65, 70-71, 77-79.   On November 19, 2007, a hearing was held before

Administrative Law Judge Edmund Round ("the ALJ").  Tr. 765-804.  On January 24, 2008, the

ALJ issued a partially favorable decision, finding that Titus was disabled as of August 15, 2007,

but not prior to that date.  Tr. 24-35.  Titus requested review of the ALJ's decision by the

Appeals Counsel.  Tr. 12.  On July 8, 2008, the Appeals Council denied Titus's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 5-7.

On March 23, 2007, Titus appealed the decision of the Commissioner to this Court, and was assigned case number 1:08-CV-2093.  Magistrate Judge Limbert issued a Report and Recommendation on July 20, 2009, in which he recommended that the decision of the Commissioner be affirmed in part and reversed in part.  Case No. 1:08-CV-2093, Doc. 19. Magistrate Judge Limbert further recommended that the Court remand the case to the Commissioner with instructions for the ALJ to articulate why the medical opinion of Paul Wilson, M.D., Titus's treating physician, was not consistent with the other evidence in the record (Tr. 849), and to determine whether there was other work in the national economy that Titus could perform.  Tr. 843.  On August 11, 2009, District Judge Boyko adopted Magistrate Judge Limbert's recommendation, reversed the decision of the Commissioner, and remanded the case to the Commissioner for further proceedings.  Case No. 1:08-CV-2093, Doc. 21.

Pursuant to the remand order, on December 11, 2009, a hearing was held before the same ALJ.  Tr. 922-53.  On January 29, 2010, the ALJ issued a decision and concluded that Dr. Wilson's opinion was not entitled to controlling weight because it was not supported by the evidence and was inconsistent with Titus's activity level.  Tr. 820-32.  The ALJ also determined that Titus could perform other jobs that existed in significant numbers in the national economy and, therefore, was not disabled for the period of December 31, 2003 to August 14, 2007.  Tr. 820-32.  Titus requested review of the ALJ's decision by the Appeals Counsel and, on April 28, 2011, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 805-807.

## II.  Evidence

### A.      Background

Titus was born on June 11, 1958.  Tr. 94.  She was 45 to 49 years old, which is defined as a younger individual age 18–49 (20 CFR §§ 404.1563 and 416.963), during the period adjudicated.  Tr. 832, 903.  She attained her high school equivalency diploma and an associate's degree.  Tr. 369, 378.  Titus previously worked as a telemarketer, a data entry clerk, a tax preparer, and a fast food worker.  Tr. 791-94, 796, 841.

### B.      Medical Evidence

#### 1.      Treatment History Concerning Titus's Physical Impairments[1]

Titus alleged she was disabled, in part, due to neck and back pain.  Tr. 98.  Lumbar spine x-rays in November 2004 showed a 5 mm spondylolisthesis[2] with bilateral spondylolysis at L5-S1.  Tr. 277.  The facet joints at this level showed degenerative joint disease.  Tr. 277.  An MRI of the lumbar spine in January 2005 showed similar findings.  Tr. 421.  An x-ray of the cervical spine in February 2005 showed a gross loss of C5-6 disc space with moderate degenerative osteophytes and a moderate narrowing of C5-6 neural foramina.  Tr. 274.  There was also advanced degenerative joint disease of the right C4-5 facet joint.  Tr. 274.

In 2004 and 2005, Titus was treated by Randy P. Plona, D.O., for her back and neck pain.  Tr. 253-93.  On January 11, 2005, he prescribed a cane for Titus.  Tr. 261.  On June 22, 2005, Dr. Plona noted that Titus presented with strange behavior and was not making sense at times.  Tr. 526-28.  Titus requested refills on her pain medications.  Tr. 526-27.  Dr. Plona noted that Titus had been taking too many pain medications and that, if her pain was that severe, she

---

[1]  Titus does not challenge the ALJ's conclusions concerning her mental impairments in this appeal.  Accordingly, this Report & Recommendation focuses on Titus's medical history as it relates to her physical impairments.

[2] Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips out of the proper alignment with the bone below it.  *See* PubMed Health: Spondylolisthesis, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002240/ .

needed to see a pain management specialist.  Tr. 527.  He also stated that he was concerned about addiction and that information from a pharmacist indicated that Titus had attempted to change the number of refills on a prescription for Tramadol from 3 to 8.  Tr. 527-28.  Dr. Plona also stated:

> [F]or as many times as I have seen her in the office complaining of pain and wanting pain meds, she never seems to act any differently than on the office visits when she has no pain.  She asked me once to fill out her disability paperwork and I said 'no'.

Tr. 528.

Titus also treated with an orthopedist, Zenos Vangelos, D.O., in 2004 and 2005.  Tr. 316-22.  Dr. Vangelos recommended that Titus attend physical therapy for her lower back.  Tr. 294-313, 318.  Dr. Vangelos also recommended epidural blocks.  Tr. 316.  On March 21, 2005, Titus was terminated as a patient of Dr. Vangelos.  Tr. 314.  During that time period, Titus also treated with Heather Scullin, D.O., and on April 15, 2005, Titus informed Dr. Scullin that she had been discharged as a patient from Dr. Vangelos due to "drug and alcohol abuse."  Tr. 381.

Titus was referred to a neurologist, Darshan Mahajan, M.D., for continued problems with her lower back.  Tr. 643-46.  On April 26, 2005, Dr. Mahajan noted scoliosis[3] of the spine and that straight leg raising caused pain bilaterally at 50º elevation.  Tr. 645.  Dr. Mahajan's impression was that Titus had bilateral S1 radiculopathic changes, as well as cervical disc disease.  Tr. 646.  He also recommended that Titus see a rheumatologist.  Tr. 646.

Titus began treating with a rheumatologist, Daniel J. Holden, M.D., in May 2005.  Tr. 578-632.  Dr. Holden ordered x-ray studies and noted that x-rays of both hands showed osteoarthritis of the DIP (distal interphalangeal) joints of the fingers.  Tr. 630.  On June 15, 2005, Dr. Holden questioned if Titus's problems were more osteoarthritis in nature (Tr. 629) but, on

---

[3] Scoliosis is an abnormal curving of the spine. *See* PubMed Health: Scoliosis, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002221/ .

May 12, 2006, he noted that her condition was more suspicious for rheumatoid arthritis.  Tr. 613.

He began her on a disease-modifying agent, beginning with Plaquenil.  Tr. 613.  By January

2007, he added Methotrexate and Prednisone (a steroid anti-inflammatory).  Tr. 591.  Dr. Holden

continued to treat Titus through August 2007, when he advised Titus that he would be closing his

practice.  Tr. 579.

    In addition to the problems with her more generalized arthritis, Titus was in a motorcycle

accident in September 2005, resulting in a non-displaced fracture of her leg near her ankle.  Tr.

420.  While this healed without incident, she began experiencing significant left knee pain.  An

MRI of the knee showed a significant medial meniscal tearing "among potential other

pathology."  Tr. 409, 417.  Her treating orthopedist, Mehrun K. Elyaderani, M.D., recommended

an arthroscopy of the left knee, which was carried out on November 29, 2005.  Tr. 414.  Dr.

Elyaderani was able to perform a partial medial meniscectomy and observed during surgery that

Titus's medial compartment, both on the femoral and tibial sides, showed grade 2 and 3 arthritic

changes.  Tr. 414-15.

    In January 2006, Titus's pain management was picked up at Westshore Family Practice,

where she ultimately began seeing Paul Wilson, M.D.[4]  In addition to maintaining her pain

medications, Dr. Wilson's office provided trigger point injections and other therapeutic

modalities.  Tr. 422-519, 521-23, 652-761.  In 2006, Titus was seen for treatment about 96 times;

in 2007, Titus was seen over 100 times for her ongoing musculoskeletal problems.  Tr. 422-519,

521-23, 652-761.  On January 29, 2007, Dr. Wilson noted that Titus's knees were "swollen like

melons."  Tr. 744.

---

[4] It is unclear from the medical records when Titus began seeing Dr. Wilson.  It appears that Titus saw Teresa
Ramsay, M.D., when she began treating at Westshore Family Practice.  Tr. 475-519.  However, by July 24, 2006,
Dr. Wilson's signature appears on the treatment notes.  Tr. 474.

On February 1, 2007, Titus saw Dr. Mahajan, who noted that Titus had been approved for an electric wheelchair due to her difficulty walking.  Tr. 634.  Titus reported to Dr. Mahajan that the arthritis in her hands had gotten worse.  Tr. 634.  On examination, Dr. Mahajan noted that Titus was "ambulating still relatively well" but that her physical endurance was low.  Tr. 635.

In August 2007 (the month the ALJ determined Titus's disability started), Titus was seen at Metrohealth Medical Center by Sean R. Waldron, M.D.  Tr. 573.  He took an x-ray of her knees, which showed severe osteoarthritis of the medial joint compartments bilaterally.  Tr. 574.  Dr. Waldron aspirated the left knee, drawing 40 cc of straw-colored fluid.  Tr. 573.  Dr. Waldron ordered a knee brace and noted that Titus would likely need a total knee replacement in the future but, given her age, she should delay as long as possible.  Tr. 573. Titus was also seen by a rheumatologist, Irving Kushner, M.D., at Metrohealth Medical Center.  Tr. 570.  On examination, there was tenderness in multiple joints of the fingers and hands with the left wrist somewhat tender and swollen.  Tr. 571.  Dr. Kushner diagnosed rheumatoid arthritis by history and examination.  Tr. 570-71.

### 2.    Dr. Wilson's November 2007 Opinions

On November 11, 2007, Paul W. Wilson, M.D., completed a questionnaire regarding Titus's physical abilities and limitations.  Tr. 763-763A.  Dr. Wilson noted that he had been treating Titus since July 2006.  Tr. 763A.  Dr. Wilson opined that Titus could stand for fifteen minutes at a time and could stand for sixty minutes per eight hour workday; could sit for fifteen minutes at a time and could sit for sixty minutes per eight hour workday; could lift and/or carry zero to five pounds occasionally and frequently; could never stoop, balance, handle or reach; could occasionally finger; could not work around dangerous machinery; and could never tolerate cold, heat, or dust, or be exposed to smoke or fumes.  Tr. 763.  Dr. Wilson also noted that Titus

had limited vision and could only occasionally operate a motor vehicle.  Tr. 763.  He further

stated that Titus would need to elevate her legs for more than two hours in an eight hour day; lie

down for more than two hours in an eight hour day; and would miss four or more days a month

due to her impairments.  Tr. 763A.  Dr. Wilson described Titus's pain as extreme, indicated that

her medications were sedating, and noted that she had "the most devastating case" of rheumatoid

arthritis that he had seen in 26 years of practicing medicine.  Tr. 763A.

### 3.        State Agency Physicians

On December 7,  2004, Titus attended a physical consultative examination with state

agency physician Dariush Saghafi, M.D.  Tr. 218-221.  Titus complained that she was depressed

and in pain.  Tr. 218.  On examination, Titus was alert and oriented to person, place and time.

Tr. 219.  She had 5/5 strength in her upper and lower extremities, normal sensation in her upper

and lower extremities, some weakness in her left leg, normal reflexes, and a normal gait.  Tr.

220.  Based on Titus's examination findings and history, Dr. Saghafi concluded that Titus had

low back and neck pain and what appeared to be clinical depression and increased thoracolumbar

lordosis (an increased curving of the spine).  Tr. 220.  Dr. Saghafi opined that Titus should be

able to perform work-related activities.  Tr. 220.  He concluded that Titus would be more relaxed

if she was allowed to work in a seated position.  Tr. 220.

On January 5, 2005, state agency physician Diane C. Manos, M.D., reviewed Titus's

medical records, including Dr. Saghafi's report, and assessed her physical residual function

capacity ("RFC").  Tr. 245.  Dr. Manos opined that Titus could perform light work[5] as long as it

---

[5]  Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing
up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good
deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg
controls."  20 C.F.R. §§ 404.1567(b), 416.967(b).

did not involve more than frequent balancing, stooping, kneeling, crouching and crawling.  Tr. 246-47.

**C.     Titus's Written Statements to the State Agency**

In October 2004, Titus provided the state agency with written statements regarding her symptoms and their impact on her ability to perform daily and social activities.  Tr. 115-22, 123-26.  Titus reported that, on a typical day, she would sit around the house and stare out the window because she was afraid of people.  Tr. 116.  Titus also stated that her fatigue was so severe that she slept 24 hours a day.  Tr. 124.  However, Titus stated that she went shopping in stores, played pool, and went to her boyfriend's pool tournaments.  Tr. 118-19.  In addition, she reported that she went outside one to two times a week and, when she did, she drove or rode in a car.  Tr. 118.  Titus also stated that she sometimes went outside by herself.  Tr. 118.

Titus reported that she could walk up to a half mile before she had to stop and rest and she could lift up to 31 pounds before she had pain in her neck and back.  Tr. 120.  She reported that she could do most of her housework, including the laundry.  Tr. 118.  Titus stated that she sometimes had difficulties taking care of her personal needs (Tr. 117) but that she helped take care of her dog (Tr. 116) and occasionally mowed the grass on a riding mower.  Tr. 118.  She said that she had difficulties paying attention (Tr. 120) but also reported that she spent 2 to 3 hours playing pool and reading.  Tr. 119.

**D.     Administrative Hearings**

**1.     Titus's Testimony**

On November 19, 2007, Titus appeared with counsel and testified at the first administrative hearing.  Tr. 765-790.  Titus stated that she stopped working at her last job as a telemarketer because she had problems sitting for eight hours a day.  Tr. 774.  She testified that

8

sitting for extended periods of time caused her back to hurt.  Tr. 774.  Titus also stated that she had problems with her knees and ankles that caused them to swell.  Tr. 776.  She stated that she used a cane and wheelchair anytime that she left the house (Tr. 775-76) and a walker when she was at home.  Tr. 775.  Titus explained that her back pain caused her the most problems.  Tr. 776.  Her treatment consisted of weekly epidural blocks, regular doctor visits, physical therapy, and medications.  Tr. 777-78, 780.  Titus stated that she sees Dr. Wilson three times per week for trigger point injections and to drain the fluids in her knee.  Tr. 778.

After the matter was remanded, the ALJ held a second administrative hearing in December 2009.  Tr. 924-53.  Titus did not attend the second administrative hearing but her attorney was present on her behalf.  Tr. 924.

## 2.      Testimony of Vocational Experts

At the first administrative hearing, Lynn Smith appeared and testified as a vocational expert ("VE Smith").  Tr. 790-804.  VE Smith testified that Titus previously had worked as a telemarketer (semi-skilled position performed at a sedentary exertional level), a data entry clerk (semi-skilled position performed at a sedentary exertional level), a tax preparer (semi-skilled position performed at a sedentary exertional level), and a fast food worker (unskilled position performed at a light exertional level).  Tr. 796.  VE Smith testified that, prior to August 15, 2007, a hypothetical worker of Titus's age, education, and RFC, would be capable of performing her past relevant work as a data entry clerk and a tax preparer.  Tr. 797.

At the second administrative hearing, held on December 11, 2009, pursuant to the remand order, the ALJ took additional evidence as to whether Titus could perform any other work that existed in significant numbers in the national economy.  Deborah Lee appeared and testified as a vocational expert ("the VE") at that hearing.  Tr. 927-44.  The ALJ asked the VE to consider

whether an individual with Titus's vocational characteristics and RFC could perform her past relevant work or any other work in the national economy.  Tr. 929-30.  The VE testified that an individual with the specified characteristics could not perform Titus's past work (Tr. 929) but that the individual could perform other jobs that exist in significant numbers in the national economy, including final assembler (1,800 jobs in Ohio and 28,000 jobs nationally), stem mounter (1,000 jobs in Ohio and 26,000 jobs nationally), and cashier (8,400 jobs in Ohio and 200,700 jobs nationally).  Tr. 931-35.  The VE also testified that, in her experience, employers generally did not like walking canes on the production floor.  Tr. 930.  The VE clarified her testimony and noted that an employer's preference regarding walking canes went to whether the individual could be placed in a job, not the individual's ability to do the job.  Tr. 930-31.  The VE testified that the hypothetical worker could do the jobs that she identified.  Tr. 931.

On cross examination, Titus's attorney questioned the VE about her testimony regarding Titus's need to use a cane.  Tr. 938.  The VE clarified that using a cane would not require a modification or be considered an accommodation.  Tr. 943-44.  However, the VE noted that using a cane might be an impediment to some cashier jobs because the individual might be required to carry a cash box or cash drawer with two hands.  Tr. 944.  The VE did not know how many cashier jobs would be ruled out as a result of the use of a cane.  Tr. 940.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).   In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.   If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).   Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

Before undertaking the sequential evaluation, the ALJ determined that Titus met the insured status requirements through December 31, 2008.  Tr. 822.  At Step One, the ALJ found that Titus had not engaged in substantial gainful activity from December 31, 2003, the alleged onset date, through August 14, 2007, the date on which he had previously found Titus to be disabled.  Tr. 822.  At Step Two, the ALJ determined that Titus had the following severe impairments: cervical degenerative disc disease; lumbar degenerative disc disease; osteoarthritis in the knees after a meniscal tear and surgical repair of the left knee; fibromyalgia; and a major depressive disorder.  Tr. 822-23.  At Step Three, the ALJ found that Titus did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[6]  Tr. 823.  The ALJ then determined Titus's RFC and found that she could perform a restricted range of sedentary work in that she could:

> [L]ift, carry, push, and/or pull a maximum of 10 pounds, could sit for 6 hours, and could stand and/or walk for 2 hours in an 8-hour day.  She required a cane in her right (dominant) hand.  She was precluded from kneeling, crouching, and crawling, and from using ladders, ropes, or scaffolds. She could not work above shoulder level bilaterally and could not perform tasks requiring hyperextension of the neck. She was limited to simple, routine, low-stress tasks.

Tr. 825.  At Step Four, the ALJ found that Titus could not perform her past relevant work.  Tr. 830.  Finally, at Step Five, the ALJ relied upon Rule 201.21 of the Medical-Vocational Guidelines (the "Grid")[7] as a framework for his decision-making, coupled with the VE's

---

[6]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[7] The Medical-Vocational Guidelines, known as the "Grid," are located at 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grid"). The Grid is composed of Rules 200.01-204.00.  *Id.*   The Grid includes rules that may be applied in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work.  20 C.F.R. § 404.1569.  However, the rules contained in the Grid do not cover all possible variations.  *Id.*

testimony, and concluded that Titus could perform jobs that existed in significant numbers in the national economy.  Tr. 831.  The ALJ therefore found that Titus was not disabled from December 31, 2003 to August 14, 2007.  Tr. 832.

## V.  Arguments of the Parties

Titus objects to the ALJ's decision on two grounds.  First, Titus argues that the ALJ did not provide legally sufficient reasons for assigning less than controlling weight to the opinions of her treating physician, Dr. Wilson.  Second, Titus contends that substantial evidence does not support the ALJ's determination under Step Five of the sequential analysis in light of Titus's recognized need for a cane.  In response, the Commissioner argues that the ALJ properly evaluated the opinions of Dr. Wilson and reasonably concluded that his opinions were not entitled to controlling weight.  The Commissioner also argues that, at Step Five, the ALJ reasonably relied on the VE's testimony that Titus could perform other work that existed in the national economy.

## VI.  Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the

13

evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ Properly Evaluated the Opinions of Dr. Wilson**

Titus asserts that the ALJ erred because he did not properly evaluate the opinions of Dr. Wilson, her treating physician.  Doc. 16, p. 9.  Specifically, she argues that the ALJ erred because he did not provide the required "good reasons" for assigning less than controlling weight to Dr. Wilson's opinions.  Contrary to this argument, the ALJ properly evaluated the opinions of Dr. Wilson under the treating physician rule and provided an adequate basis for assigning his opinions less than controlling weight.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

In his November 2007 assessment, Dr. Wilson opined that Titus could only stand and sit for one hour in an eight hour day, for no more than 15 minutes at a time; could lift and carry up to five pounds; could occasionally finger; and could never stoop, balance, handle, reach or work around dangerous equipment.  Tr. 763.  Dr. Wilson also found that Titus could not tolerate heat, cold, dust, smoke or fumes; could only occasionally operate a motor vehicle; would need to elevate her legs for more than two hours in an eight hour day; and would need to lie down for more than two hours in an eight hour day.  Tr. 763-63A.  Dr. Wilson also stated that Titus's impairments would affect her ability to maintain attention and concentration and cause her to miss 4 or more days of work per month.  Tr. 763A.

The ALJ correctly noted that, to the extent that Dr. Wilson concluded that Titus was unable to work, the ALJ was not obligated to give any weight to this opinion.  A medical source's statement on an issue reserved for the Commissioner, such as an assertion that a claimant is "disabled" or "unable to work," is a legal conclusion and not a medical opinion.  20 C.F.R. § 416.927(e).  Such statements are not entitled to any special significance.  20 C.F.R. § 416.927(e)(3).  "The determination of disability is ultimately the prerogative of the

Commissioner, not the treating physician." *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).

Additionally, the ALJ evaluated Dr. Wilson's assessment and reasonably decided to give it weight, but not controlling weight.  Tr. 826-27.  The ALJ explained that he gave less weight to the opinion of Dr. Wilson because he was not a specialist, his opinion was inconsistent with the objective medical evidence, and his opinion was not supported by the evidence as a whole.  Tr. 827.  For example, the ALJ explained that Titus's daily activities between December 31, 2003, and August 14, 2007, indicated that she was more capable than the limitations found by Dr. Wilson.  The evidence showed that Titus drove a motorcycle, did housework, occasionally mowed the grass on a riding mower, took care of her pet dog, and traveled to Florida.  Tr. 118, 349, 555, 777.  Titus also shopped in stores, played pool, attended pool tournaments, and drove a car. Tr. 120.  The extreme limitation found by Dr. Wilson, i.e., that Titus could only lift 5 pounds, is inconsistent with the evidence of her daily activities.  Indeed, the fact that Titus could drive a motorcycle, which weighs significantly more than 5 pounds, as well as her other activities, evidences that Titus's limitations were not as severe as found by Dr. Wilson.  Titus argues that the ALJ's reliance on her daily activities was in error because her activities were not dispositive of whether she could do full-time work.  Doc 16, p. 15.  However, the ALJ did not equate Titus's daily activities with an ability to engage in full-time work.  Instead, he noted that the limitations found by Dr. Wilson were inconsistent with Titus's level of activity, and used this as a factor for discounting Dr. Wilson's opinion.

The ALJ also found that Dr. Wilson's opinion was entitled to less weight because he was not a rheumatologist and because there was a lack of objective medical evidence that Titus actually suffered from rheumatoid arthritis, which Dr. Wilson opined was the cause of all of her

16

limitations, during the relevant time frame.  Tr. 827.  *See also* 20 C.F.R. §§ 404.1527(d)(5),

416.927(d)(5) ("Specialization. We generally give more weight to the opinion of a specialist

about medical issues related to his or her area of specialty than to the opinion of a source who is

not a specialist.").  The ALJ noted that Dr. Wilson had stated that Titus had the most devastating

case of rheumatoid arthritis he had ever seen, even though he was not a rheumatologist.  Tr. 827

(citing Tr. 763).  The ALJ found this to be significant because the diagnosis of rheumatoid

arthritis had been questioned by a rheumatologist in 2005 and laboratory testing did not yield

serologic evidence of the disease.  Tr. 827 (citing Tr. 571-72).  It was reasonable for the ALJ to

rely on the lack of diagnosis from a specialist and the lack of objective medical tests showing

rheumatoid arthritis in determining what weight to assign to Dr. Wilson's opinion.

Titus contends, however, that Dr. Wilson's reference to rheumatoid arthritis was

immaterial because degenerative arthritis could have caused her functional limitations. Doc. 16,

p. 14.  Titus's argument undermines the accuracy and reliability of Dr. Wilson's opinion.  Dr.

Wilson specifically opined that all of Titus's limitations were caused by rheumatoid arthritis.  Tr.

763A.  If Dr. Wilson believed that degenerative arthritis was the cause of Titus's limitations, he

would have given that opinion in his assessment.  Given Dr. Wilson's strong reliance on

rheumatoid arthritis as the disabling condition, it was reasonable for the ALJ to note the lack of

clinical findings supporting a diagnosis. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th

Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by

objective medical evidence."); SSR 96-2p ("It is an error to give an opinion controlling weight

simply because it is the opinion of a treating source if it is not well-supported by medically

acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other

substantial evidence in the case record.").

17

The ALJ noted additional inconsistencies between Dr. Wilson's opinions and other evidence of record. Tr. 827. Dr. Wilson opined that Titus's limitations were so severe that she could not even perform sedentary work. Tr. 763-763A. However, all of the state agency reviewing physicians found that Titus could perform at least some work. Significantly, agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues. *See* 20 C.F.R. § 416.927. Dr. Saghafi, the state agency physician who examined Titus, found that she had full motor strength except for some "give away weakness" in the left lower extremity and decreased range of motion in the lumbar spine. Tr. 219. Dr. Saghafi also noted that Titus had normal sensation in her upper and lower extremities, normal reflexes, and a normal gait. Tr. 220. Although Dr. Saghafi noted that Titus had back and neck pain, and what appeared to be clinical depression and increased thoracolumbar lordosis (Tr. 220), he nevertheless found that she could work as long as she was not required to do heavy lifting, bending, stooping, or pushing and pulling at heavy levels. Tr. 220. Furthermore, state agency physician Dr. Manos concluded that Titus could work despite her impairments. Tr. 246-52. All of this evidence supports the ALJ's determination to give less than controlling weight to Dr. Wilson's opinion.

The ALJ's explanation demonstrates that he properly considered the controlling regulatory factors, as well as the Court's remand order, and discounted Dr. Wilson's opinion based on his lack of specialization, the supportability of his opinion, and the consistency of his opinion with the record. The ALJ therefore stated good reasons for assigning less than controlling weight to Dr. Wilson's opinion and fulfilled his obligations under the regulations. *See, e.g., Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason

was brief but reached several of the factors an ALJ must consider when determining what weight to give non-controlling opinion).

Notwithstanding the foregoing, Titus makes several formalistic challenges to the ALJ's evaluation of Dr. Wilson's opinions.  First, even though the ALJ did provide good reasons for assigning less weight to Dr. Wilson's opinion, Titus argues that the ALJ violated the District Court's remand order because he did not specifically cite to the factors set forth in 20 C.F.R. § 404.1527(d) or formally recite whether he was giving Dr. Wilson's opinion controlling weight. Doc. 14, p. 11.  This argument elevates form over substance.  As discussed above, the ALJ explained the weight he assigned to Dr. Wilson's opinion and his analysis demonstrates that he clearly considered all of the relevant evidence, as well as the regulatory factors, in reaching his determination.  The ALJ's analysis of Dr. Wilson's opinion allows the Court to conduct a meaningful review and to determine the weight provided to the opinion.  *Rogers v. Comm'r of Soc. Sec,* 486 F.3d 234, 242-43 (6th Cir. 2007); *see also Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462 (6th Cir. 2006) (finding that a failure to explicitly indicate the weight afforded to a doctor's opinion to be harmless error where the goal of providing good reasons was met).  The ALJ complied with the substance of the treating physician rule because he gave good reasons for not giving controlling weight to the opinion of Dr. Wilson and, accordingly, Titus is not entitled to remand on this argument.  *See Hardie v. Astrue*, No. 5:09CV1627, 2010 WL 5124731 (N.D. Ohio Oct. 29, 2010) (remand not proper when the ALJ complied with the goals of the procedural requirements of the treating physician rule).

Titus also argues that the ALJ committed reversible error because he did not specifically discuss each of the limitations set forth by Dr. Wilson in his assessment. Doc. 16, p. 15. However, the ALJ was not required to discuss each limitation separately.  The ALJ listed all of

19

the limitations found by Dr. Wilson and provided good reasons for assigning less than controlling weight to Dr. Wilson's assessment as a whole. As noted in Social Security Ruling ("SSR") 96-2p, "it is not necessary in every case to evaluate each treating source medical opinion separately . . . Adjudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a single source." SSR 96-2p, 1996 WL 374188, *2. Thus, the fact that the ALJ did not specifically address each of the limitations set forth by Dr. Wilson does not, *ipso facto*, amount to reversible error. Further, it is well settled that "an ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec*., 167 Fed. App'x. 496, 508 (6th Cir. 2006) (quoting *Loral Defense Systems-Akron v. N.L.R.B*., 200 F. 3d 436, 453 (6th Cir. 1999)). The ALJ's explanation shows that he considered Dr. Wilson's entire opinion and concluded that it was against the weight of the evidence and not entitled to controlling weight.

In sum, the ALJ complied with the treating physician rule because he applied the correct legal standard and provided good reasons for assigning less than controlling weight to the opinion of Dr. Wilson. Accordingly, the ALJ properly evaluated the opinion of Dr. Wilson.

**B.    The ALJ Satisfied the Commissioner's Burden at Step Five of the Sequential Analysis**

Titus argues that substantial evidence does not support the ALJ's decision at Step Five because of Titus's recognized need for a cane. Doc. 16, p. 16. Once it has been determined that a claimant cannot perform her past relevant work, the burden shifts to Commissioner at Step Five to show that there are other jobs that exist in significant numbers in the economy that the claimant can perform, consistent her RFC and vocational factors of age, education and work experience. *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

To satisfy this burden, the ALJ may rely on the testimony of a vocational expert as long as it is in response to a hypothetical that accurately reflects the claimant's physical and mental limitations. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  In formulating the hypothetical, the ALJ only needs to incorporate those limitations he accepts as credible.  *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

In this case, the ALJ asked the VE if there were any jobs in the national economy that an individual with Titus's vocational characteristics and RFC could perform.  Tr. 928-29.  The ALJ specifically noted that the individual would need a "cane or the equivalent in her right hand."  Tr. 928.  In response, the VE identified several jobs that the individual could perform, including final assembler (1,800 jobs in Ohio and 28,000 jobs nationally), stem mounter (1,00 jobs in Ohio and 26,000 jobs nationally), and cashier (8,400 jobs in Ohio and 200,700 jobs nationally).  Tr. 931-35.  Titus argues that the ALJ could not rely on the jobs identified by the vocational expert because they require a workplace accommodation for the use of a cane.  Doc. 16, p. 17.  This argument is without merit.

As correctly noted by Titus, the Supreme Court has stated that, "[W]hen the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodations' into account . . . ."  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *see Jones v. Apfel,* 174 F.3d 692, 693 (5th Cir. 1999) ("[A] vocational expert should not base his determination of the availability of jobs on the assumption that the ADA requires an employer to accommodate an individual's disability."); *Griffith v. Wal-Mart Stores, Inc.,* 135 F.3d 376, 380 (6th Cir. 1998) ("the Social Security Administration does not consider whether an individual is able to work with reasonable accommodation in determining entitlement to disability benefits.").  Thus, the ALJ is not entitled

to consider potential accommodation by employers in determining the availability of jobs in the national economy that a claimant can perform.  *See id.*

Here, the VE testified that the jobs she identified would not have to be modified to allow the hypothetical individual to use a cane.  Tr. 944.  Titus maintains, however, that some other aspect of the jobs, such as work on a factory or production floor, could require the use of a cane, and, therefore, would require a work place accommodation that cannot be considered by the ALJ at Step Five.  Doc. 16, pp. 18-19.  Titus misconstrues the VE's testimony.  Even though the VE testified that, in her experience, employers did not generally want an employee using a cane on a production floor, she explicitly stated that the employer's preference concerned the individual's ability to be placed in a job, not whether the individual had the ability to perform the job, i.e., to do the work if hired.[8]  Tr. 931.  Indeed, the VE specifically stated that no modification was required in the tasks or in "performing the work."  Tr. 944.  The VE never suggested that the hypothetical individual might require a "reasonable accommodation" in order to perform the work or that she assumed an employer would be willing to make such accommodations.  Nor did she testify that the hypothetical individual's employability was contingent on whether an employer was willing to make an accommodation.  Instead, the VE identified three jobs that the hypothetical individual could perform, taking into account the need to use a cane.  Tr. 931. Notably, Titus does not challenge the ALJ's RFC determination and the VE's testimony was in

---

[8] The VE testified as follows at the hearing:

    A.   I guess, in my experience, employers really generally don't like a cane walking on to a production floor.
    Q.  Okay.  Does that go to, it seems like that goes to employability rather than to ---
    A.  It goes probably to placability.

Tr. 930.  "[P]lacability," appears to have been a misspelling by the court reporter, given the context of the VE's testimony.  The word should have been spelled "placeability," a word the VE used as a synonym for "employability," a term the ALJ used to mean the ability of a hypothetical worker to be placed in a job, which is distinguished from the ability of the hypothetical worker to actually perform the work associated with the job. Indeed, an employer might not want to hire a person who used a cane, but the person could do the job if hired.  In any event, the VE clarified her testimony at page 944 of the transcript by stating that the hypothetical worker could perform the jobs she identified without any work place accommodations.  Tr. 944.

response to a hypothetical question that accurately set forth Titus's limitations, as determined in the RFC. The ALJ was therefore entitled to rely on the VE's testimony. *See Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777 (6th Cir. 1987) ("substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only if the question accurately portrays plaintiff's individual physical and mental impairments.").

Finally, Titus contends that the VE's testimony with regard to the cashier position cannot be accepted as evidence because the VE testified that she did not know how many cashier jobs were available to a person with a cane. On cross-examination, Titus's attorney questioned the VE about her testimony regarding Titus's need to use a cane. Tr. 938. The VE acknowledged that using a cane might be an impediment in some cashier jobs because the individual might be required to carry a cash box or cash drawer with two hands. Tr. 944. The VE did not know how many cashier jobs would be ruled out as a result of the use of a cane. Tr. 940. Because of this uncertainty with regard to the actual number of cashier jobs that could be performed with a cane, there is not substantial evidence that a significant number of cashier jobs existed in the national economy that Titus could actually perform. As a result, the ALJ should not have considered the job of cashier in making his determination under Step Five.

Eliminating the cashier job from consideration, Titus argues that it is unclear if the number of jobs for the remaining two jobs identified by the VE – final assembler and stem mounter – were a significant number of jobs in the national economy. Doc. 21, pp. 1-2. In particular, Titus contends that, locally, the Commissioner only identified 750 jobs she could perform and that this number is not a significant number of jobs. Titus therefore argues that remand is appropriate for a determination as to whether there is work available in significant

numbers in the national economy that Titus could perform.  This argument is also unpersuasive.

Work in the national economy is defined to mean work that exists "in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1566.  The Sixth Circuit has considered the meaning of the term "region" and stated:

> We believe it is clear that the term 'region' is flexible and that the Secretary did not err in considering the number of jobs existing in the entire State of Michigan . . . . The fact that the statute speaks in terms of work existing in the national economy and does not restrict the Secretary to consideration of work that exists in the immediate area of a claimant's residence gives the Secretary sufficient latitude to treat an entire state as the region to be considered.

*Pollice v. Secretary of Health and Human Services,* 843 F.2d 1392 (6th Cir.1988).  Titus's focus on her immediate area, as opposed to the regional economy, is therefore without merit.  Further, the Sixth Circuit has made clear that there is no "special number which is to be the boundary between a 'significant number' and an insignificant number of jobs." *Hall v. Bowen,* 837 F.2d 272, 275.

The VE testified that, given Titus's limitations, she would also be able to perform the jobs of final assembler, numbering 250 jobs in Northeast Ohio, 1,800 jobs in Ohio and 28,000 jobs in the national economy; and the job of stem mounter, numbering 500 jobs in Northeast Ohio, 1,000 jobs in Ohio and 26,000 jobs in the national economy.  Tr. 931-32.  Thus, the total number of jobs in Ohio that Titus could perform was 2,800, and the number of jobs in the national economy was 54,000.  These numbers satisfied the ALJ's burden at Step Five to show the existence of a significant number of jobs in the national economy that Titus could perform. *Pollice,* 843 F.2d 1392 (3,600 jobs in Michigan was significant number of jobs); *Hall,* 837 F.2d at 275 (1,350 jobs in Ohio was a significant number of jobs); *see also Craigie v. Bowen,* 835 F.2d 56, 58 (3rd Cir. 1987) (200 jobs in region was a significant number of jobs); *Allen v.*

24

*Bowen,* 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs in region, 1,600 in state, and 80,000 nationally was significant number); *McCallister v. Barnhart,* 2004 WL 1918724, *5 (D. Me. Aug. 26, 2004) (372 jobs in Maine and 50,955 nationally was significant number).  Accordingly, under the deferential standard of review, there is substantial evidence in the record to support the ALJ's finding that there are a significant number of jobs in the national economy that Titus could perform.

### VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner finding that Plaintiff Tammy J. Titus was not disabled for the period of December 31, 2003 to August 14, 2007, should be AFFIRMED.

Dated: June 12, 2012

Kathleen B. Burke
United States Magistrate Judge

### <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).