PEARSON, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| TAMMY J. TITUS, | ) | CASE NO. 1:11CV01286 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |

Before the Court are Plaintiff Tammy Titus's ("Titus") objections to the Report and
Recommendation of Magistrate Judge Kathleen B. Burke recommending that the Court affirm
the Commissioner of the Social Security Administration's decision denying Titus's Supplemental
Security Income ("SSI") and Disability Insurance Benefits ("DIB").  ECF No. 23.  As explained
below, the Court affirms the Report and Recommendation denying benefits to Titus to the extent
that it is not inconsistent with this Memorandum of Opinion and Order.  Accordingly, Titus's
objections are overruled.

## I.  Background

### A.  Factual History

Titus was born on June 11, 1958.  (Tr. 49).  After obtaining her high school equivalency
diploma and associate's degree (Tr. 369, 378), Titus worked as a telemarketer, data entry clerk,
tax preparer, and fast food worker.  (Tr. 791-94, 841); ECF No. 22.  Titus alleged she was
disabled, in part, due to neck and back pain.  (Tr. 98).  Randy P. Plona, D.O. treated Titus  for

(1:11CV01286)

her back and neck pain during 2004 and 2005. (Tr. 253-93). On January 11, 2005, he prescribed

a cane for Titus. (Tr. 261). Titus requested refills on her pain medications, and on June 22,

2005, Dr. Plona observed that Titus presented with strange behavior and was incoherent. (Tr.

526-28). Dr. Plona found that Titus was taking too many pain medications and that she needed

to see a pain management specialist. (Tr. 527). He also stated that he was concerned about

addiction, and a pharmacist indicated that Titus had attempted to change the number of refills on

a prescription for Tramadol from three to eight. (Tr. 527-28).

Zenos Vangelos, D.O., an orthopedist, also treated Titus beginning in 2004 (Tr. 316-22)

and ending on March 21, 2005, when Dr. Vangelos terminated his relationship with her as a

patient. (Tr. 314). Heather Scullin, D.O. treated Titus also, and on April 15, 2005, Titus

informed Dr. Scullin that she had been discharged as a patient from Dr. Vangelos due to "drug

and alcohol abuse." (Tr. 381).

Titus provided the state agency with written statements regarding her symptoms in

October 2004 as well as their impact on her ability to perform daily and social activities. (Tr.

115-22, 123-26). Titus reported that, on a typical day, she would sit around the house and stare

out the window because she was afraid of people. (Tr. 116). Titus also stated that her fatigue

was so severe that she slept twenty-four hours a day. (Tr. 124). Titus, however, stated that she

went shopping in stores, played pool, and went to her boyfriend's pool tournaments. (Tr.

118-19). In addition, she reported that she went outside one to two times a week and, when she

did, she drove or rode in a car and sometimes went outside by herself. (Tr. 118). Titus reported

that she could walk up to a half mile before she had to stop and rest, and she could lift up to

2

(1:11CV01286)

thirty-one pounds before she had pain in her neck and back. (Tr. 120). She reported that she could do most of her housework, including the laundry. (Tr. 118). Titus stated that she sometimes had difficulties taking care of her personal needs (Tr. 117), but she helped take care of her dog (Tr. 116) and occasionally mowed the grass on a riding mower. (Tr. 118). She said that she had difficulties paying attention (Tr. 120) but also reported that she spent two to three hours playing pool and reading. (Tr. 119).

A state agency physician, Dariush Saghafi, M.D., performed a physical consultative examination of Titus on December 7, 2004. (Tr. 218-221). During that examination, Titus complained that she was depressed and in pain. (Tr. 218). Dr. Saghafi found that Titus was alert and oriented to person, place, and time. (Tr. 219). Titus had normal strength in her upper and lower extremities, normal sensation in her upper and lower extremities, some weakness in her left leg, normal reflexes, and a normal gait. (Tr. 220). Based on Titus's examination findings and history, Dr. Saghafi concluded that Titus had low back and neck pain, clinical depression, and increased thoracolumbar lordosis (an increased curving of the spine). (Tr. 220). He concluded that Titus would be more relaxed if she was allowed to work in a seated position. (Tr. 220). Dr. Saghafi opined that Titus should be able to perform work-related activities. (Tr. 220).

A second state agency physician, Diane C. Manos, M.D., reviewed Titus's medical records on January 5, 2005, including Dr. Saghafi's report, and assessed her physical residual function capacity. (Tr. 245). Dr. Manos opined that Titus could perform light work that did not

(1:11CV01286)

involve more than frequent balancing, stooping, kneeling, crouching and crawling.[1]  (Tr. 246-47).

Daniel J. Holden, M.D., a rheumatologist, began treating Titus in May 2005.  (Tr. 578-632).  Dr. Holden found that x-rays of both hands showed osteoarthritis.  (Tr. 630).  On June 15, 2005, Dr. Holden questioned if Titus's problems originated from osteoarthritis (Tr. 629) but, on May 12, 2006, he noted that her condition was more suspicious for rheumatoid arthritis.  (Tr. 613).  He prescribed a disease-modifying agent, (Tr. 613) and by January 2007, he added Methotrexate and Prednisone (a steroid anti-inflammatory) to her treatment regimen.  (Tr. 591).  Dr. Holden continued to treat Titus through August 2007, until he closed his practice.  (Tr. 579).

In addition to her other ailments, Titus suffered a non-displaced fracture of her leg as a result of a motorcycle accident in September 2005.  After experiencing significant left knee pain, a MRI of the knee showed a significant medial meniscal tearing "among potential other pathology."  (Tr. 409, 417).  Mehrun K. Elyaderani, M.D., her treating orthopedist, recommended an arthroscopy of the left knee, which was carried out on November 29, 2005.  (Tr. 414).  Dr. Elyaderani observed during surgery that Titus's medial compartment showed grade two and three arthritic changes.  (Tr. 414-15).

---

[1]  Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b), 416.967(b).

4

(1:11CV01286)

Titus's pain management continued at Westshore Family Practice in January 2006, where she ultimately began seeing Paul Wilson, M.D.[2]  In addition to maintaining her pain medications, Dr. Wilson's office provided trigger point injections and other therapeutic modalities.  (Tr. 422-519, 521-23, 652-761).  Titus visited Westshore Family Practice about ninety-six  times in 2006.  In total, Titus was seen over one-hundred times for her ongoing musculoskeletal problems.  (Tr. 422-519, 521-23, 652-761).  On January 29, 2007, Dr. Wilson noted that Titus's knees were "swollen like melons."  (Tr. 744).

On February 1, 2007, Darshan Mahajan, M.D. of Neurology Center, Inc. approved Titus for an electric wheelchair due to her difficulty walking, and Dr. Mahajan documented he was under the impression that Titus suffered from osteoarthritis.  (Tr. 634).  Titus reported to Dr. Mahajan that the arthritis in her hands had gotten worse.  (Tr. 634).  On examination, Dr. Mahajan noted that Titus was "ambulating still relatively well" but that her physical endurance was low.  (Tr. 635).

In August 2007,  the same month the ALJ[3]  determined Titus's disability started, Sean R. Waldron, M.D. examined Titus at Metrohealth Medical Center.  (Tr. 573).  He ordered an x-ray of her knees, which showed severe osteoarthritis.  (Tr. 574).  Dr. Waldron aspirated the left knee, obtaining forty milliliters of straw-colored fluid.  (Tr. 573).  Dr. Waldron ordered a knee brace

---

[2] It is unclear from the medical records when Titus began seeing Dr. Wilson. It appears that Titus saw Teresa Ramsay, M.D., when she began treating at Westshore Family Practice. (Tr. 475-519). Dr. Wilson's signature, however,  appears by July 24, 2006, on the treatment notes. (Tr. 474).

[3] Administrative Law Judge

(1:11CV01286)

and noted that Titus would likely need a total knee replacement in the future but she should delay as long as possible because of her age.  (Tr. 573).   Irving Kushner, M.D., a rheumatologist, also treated  Titus at Metrohealth Medical Center, and he noted there was tenderness in multiple joints of the fingers and hands with the left wrist somewhat tender and swollen.  (Tr. 570-71).  Only considering his history and physical of Titus, Dr. Kushner diagnosed Titis with rheumatoid arthritis.  (Tr. 570-71).

Paul W. Wilson, M.D., completed a questionnaire on November 11, 2007,  regarding Titus's physical abilities and limitations.  (Tr. 763-763A).  Dr. Wilson noted that he had been treating Titus since July 2006.  (Tr. 763A).  Dr. Wilson opined that Titus could stand for fifteen minutes at a time and could stand for sixty minutes per eight hour workday; could sit for fifteen minutes at a time and could sit for sixty minutes per eight hour workday; could lift and/or carry zero to five pounds occasionally and frequently; could never stoop, balance, handle or reach; could occasionally finger; could not work around dangerous machinery; and could never tolerate cold, heat, or dust, or be exposed to smoke or fumes.  (Tr. 763).  Dr. Wilson also noted that Titus had limited vision and could only occasionally operate a motor vehicle.  (Tr. 763).  He further stated that Titus would need to elevate her legs for more than two hours in an eight hour day; lie down for more than two hours in an eight hour day; and would miss four or more days a month due to her impairments.  (Tr. 763A).  Dr. Wilson described Titus's pain as extreme, indicated that her medications were sedating, and noted that she had "the most devastating case" of rheumatoid arthritis that he had seen in twenty-six years of practicing medicine.  (Tr. 763A).

6

(1:11CV01286)

### B.  Procedural History

Titus filed her application for DIB on June 15, 2004 and her application for SSI on June

17, 2005.  In both applications, she alleged disability date of December 31, 2003 due to

depression, back and neck pain, and arthritis.  ECF No. 22; (Tr. 822); ECF No. 22; (Tr. 70, 77).

The Commissioner initially denied Titus's application for DIB and SSI benefits, which was

subsequently denied upon reconsideration.  (Tr. 77).  The ALJ, Edmund Round presided over the

first hearing, and he issued a partially favorable decision, which held that Titus was disabled as

of August 15, 2007, but not prior to that date.  ECF No. 22.  Titus requested the Appeal Council

review the ALJ's decision praying for benefits beginning on her initial filing date of December

31, 2003 through August 14, 2007. (Tr. 12).   The Appeals Council denied Titus's request for

review, which rendered the decision of the ALJ final.

Titus filed her first civil action in the district court, and upon review, the court remanded

the case for further proceedings before the ALJ.  The court ordered the ALJ to articulate why the

medical opinion of Paul Wilson, M.D., as Titus's treating physician, was not given controlling

weight (Tr. 849), and ordered the ALJ to determine whether there were a significant number of

jobs in the national economy available to Titus.  (Tr. 843).

On December 11, 2009, pursuant to the remand order, the ALJ took additional evidence

as to whether Titus could perform any other work that existed in significant numbers in the

national economy.  Deborah Lee testified as a Vocational Expert ("VE") at that hearing.  (Tr.

927-44).  The ALJ asked Lee to consider whether an individual with Titus's vocational

characteristics and RFC could perform her past relevant work or any other work in the national

(1:11CV01286)

economy.  (Tr. 929-30).  Lee testified that an individual with the specified characteristics could

not perform Titus's past relevant work.  (Tr. 929)  Lee stated that the hypothetical individual

could perform other jobs that exist in significant numbers in the national economy, including

final assembler (1,800 jobs in Ohio and 28,000 jobs nationally), stem mounter (1,000 jobs in

Ohio and 26,000 jobs nationally), and cashier (8,400 jobs in Ohio and 200,700 jobs nationally).

(Tr. 931-35).  Lee also testified that, in her experience, employers generally did not like walking

canes on the production floor.  (Tr. 930).  Lee clarified her testimony and noted that an

employer's preference regarding walking canes went to whether the individual could be placed in

a job, not the individual's ability to do the job.  (Tr. 930-31).  Lee testified that the hypothetical

worker could do the jobs that she identified. (Tr. 931).

On cross examination, Titus's attorney questioned Lee about her testimony regarding

Titus's need to use a cane.  (Tr. 938).  Lee clarified that using a cane would not require a

modification or be considered an accommodation.  (Tr. 943-44).  Lee stated, however, that using

a cane might be an impediment to some cashier jobs because the individual might be required to

carry a cash box or cash drawer with two hands.  (Tr. 944).  Lee did not know how many cashier

jobs would be ruled out as a result of the use of a cane. (Tr. 940).

After a second hearing, the ALJ elaborated that Dr. Wilson's opinion was not entitled to

controlling weight because it was not supported by the evidence and was inconsistent with

Titus's activity level. ECF No. 22; (Tr. 820-823).  The ALJ also concluded that Titus could

perform other jobs that existed in significant numbers in the national economy.  ECF No. 22; (Tr.

820-832).  The ALJ, once again, concluded Titus was not disabled for the time period of

(1:11CV01286)

December 31, 2003, to August 14, 2007.  ECF No. 22;  (Tr. 820-32).  Titus requested review of

the ALJ's decision by the Appeals Council, but the Appeals Council denied the review making

the ALJ's decisions the final decision of the Commissioner.  (Tr. 805-807).

> In the present case, Titus's second civil action raises the following legal issues:
>
> > 1. Did the ALJ on-court remand give legally sufficient reasons for
> > giving less weight to Dr. Wilson's opinion?
> >
> > 2. Did the ALJ make harmful errors pertaining to the need of Titus
> > for a cane as a reasonable accommodation for the workplace?

ECF No. 16.  The magistrate judge issued a Report recommending that the Court affirm the

Commissioner's decision denying Titus benefits for the period of December 31, 2003 to August

14, 2007.  ECF No. 22.

> Titus raises the following objections to the magistrate judge's Report and

Recommendation: (1) the ALJ is not in compliance with the District Court's remand orders  to

explain the evaluation of Dr. Wilson's opinion as Titus's treating physician as to why it was not

accorded controlling weight; (2) the ALJ incorrectly relied on the VE's testimony during his Step

Five determination; and (3) a significant number of jobs in the national economy were not

available to Titus to satisfy Step Five of the sequential evaluation process.  ECF. No. 23.  The

Defendant responded to Titus's objections asserting: (1) Titus's objections are not timely[4]; (2)

the magistrate judge correctly found that the ALJ's Step-Five finding was supported by

substantial evidence; (3) the magistrate judge correctly concluded that the ALJ properly weighted

---

[4] The magistrate judge filed her report and recommendation on June 12, 2012, and Titus filed her objections on June 29, 2012.

(1:11CV01286)

the medical opinion of Dr. Wilson, Titus's treating physician.  ECF No. 25.  The Court addresses

each objection and response below.

      For the reasons given herein, the Commissioner's decision is affirmed, and the magistrate

judge's Report and Recommendation is adopted to the extent it is not inconsistent with this

opinion.

## II. Legal Standard

### A.  Standard of Review

      A district court is required to conduct a *de novo* review of the claimant's objections to a

report and recommendation.  28 U.S.C. § 636(b)(1).  A final decision of the Social Security

Commissioner made by an ALJ is, however, not reviewed *de novo*.  Rather, a district court is

limited to examining the entire administrative record to determine whether the ALJ's decision is

"supported by substantial evidence and was made pursuant to proper legal standards."  *Rogers v.

Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

      Substantial evidence is evidence that a "reasonable mind might accept as adequate to

support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation

omitted).  The substantial evidence standard requires more than a scintilla, but less than a

preponderance of the evidence.  *Id*.  In deciding whether substantial evidence supports the ALJ's

decision, a court should not try to resolve conflicts in evidence or decide questions of credibility

(*Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)), nor should a district court focus or base

its decision on a single piece of evidence.  Instead, a court must consider the record taken as a

whole.  *See Allen v. Califano*, 613 F.2d 139, 147 (6th Cir. 1980).  The district court may,

(1:11CV01286)

however, look into any evidence in the record, regardless of whether it has been cited by the ALJ.

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

When substantial evidence supports the ALJ's decision, a court may not reverse, even if the court would have made a different decision than the ALJ made.  *Siterlet v. Sec. of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  It is a "well-established rule, however, that an agency's  action may not be upheld on grounds other than those relied on by the agency." *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 420 (1992).  A reviewing court is powerless to affirm an agency decision where the grounds communicated by the agency are inadequate or improper, or fail to articulate the grounds for the decision. *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 169 (1962) (describing this tenet as a "simple but fundamental rule of administrative law"); *see also Berryhill v. Shalala*, Case No. 92-5876, 1993 WL 361792 at *7 (6th Cir. Sep. 16, 1993) (applying this rule in the Social Security context). Further, "even if supported by substantial evidence, a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotation omitted).

**B.  Standard for Establishing Disability**

To establish disability under the Social Security Act, a claimant must show that he is unable to engage in substantial activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months."  *See* 42 U.S.C. §§

11

(1:11CV01286)

423(d)(1)(A), 1382c(a)(3)(A).  The claimant's impairment must prevent him from doing his previous work, as well as any other work existing in significant numbers in the national economy.  42 U.S.C. § 423(d)(2)(A).  In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability.  20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

To determine whether a claimant is disabled, agency regulations provide a five-step sequential evaluation.  If a claimant can be found disabled at any step of the sequential evaluation, the review ends.  20 C.F.R. § 404.1520(a)(4); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).  During Step One, the ALJ determines whether the claimant is engaged in a "substantial gainful activity" at the time he seeks disability benefits.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. § 416.972(a).  Gainful work activity is work activity that is done for pay or profit, whether or not a profit is realized.  20 C.F.R. § 416.972(b).  In Step Two, the plaintiff must show that he "suffers from a severe impairment in order to warrant a finding of disability."  *Colvin*, 475 F.3d at 730 (internal quotation marks omitted).  An impairment is severe when it significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 416.920(c).  In Step Three of the analysis, the ALJ determines whether the claimant has an impairment that satisfies the criteria of an impairment listed in Appendix 1 and that also meets the durational requirement.  *See* 20 C.F.R. § 404 Subpart P, Appendix 1.  A claimant is deemed disabled if he has an impairment that meets both the listing and the duration requirement.  Before considering the Step Four, the ALJ must

12

(1:11CV01286)

determine the claimant's Residual Functional Capacity ("RFC"), *i.e.*, the claimant's ability to perform physical and mental work on a sustained basis despite limitations from impairments.

At Step Four, the ALJ considers whether the claimant's RFC permits him to perform past relevant work, which is defined as substantial gainful activity performed within the past fifteen years and lasting long enough for the claimant to learn to perform it. 20 C.F.R. § 416.960(b)(1). The claimant bears the burden of proof at Steps One through Four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). At Step Five, however, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that fit the claimant's RFC and vocational profile. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

### III. Analysis

Because the ALJ found that Titus is unable to perform her past relevant work (Tr. 830), the Court will focus on resolving Step Five issues, the basis for Titus' objections. ECF No. 23.

### A. The Proper Evaluation of Evidence

#### 1. Legal Authority

During a Step Five determination, the ALJ uses the RFC he previously determined considering all relevant evidence in the record, including physician opinions. The RFC is the most the claimant can perform despite her limitations considering all relevant evidence in the 20 C.F.R. § 416.946(c). The treating physicians rule requires an ALJ to give the opinion of a treating source controlling weight if the ALJ finds the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th

(1:11CV01286)

Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the opinion of a treating physician is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

The ALJ must, in addition to consideration of the factors above, provide "good reasons" for giving the opinion of a treating physician less than controlling weight. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be "supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996). This requirement is not simply a formality; it is there to safeguard the claimant's procedural rights. The requirement is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [she] is not." *Cole v. Astrue*, 652 F.3d 653, 659 (6th Cir. 2011) (citing *Wilson*, 378 F.3d at 544).

14

(1:11CV01286)

## 2.  The ALJ Attribute Proper Weight to Dr. Wilson's Opinion

The ALJ did not give Dr. Wilson's opinion controlling weight, nor did he indicate that he rejected it.  The ALJ stated "Dr. Wilson's opinion is given less weight."  (Tr. 827).  Titus argues that the ALJ should have given her treating physician's opinion controlling weight at Step Five.  ECF No. 23.  The defendants argue that the ALJ attributed the proper weight to the medical opinion of Dr. Wilson.  ECF No. 25.  The Court agrees.

The Court concludes that the ALJ properly analyzed the factors above in deciding how much, if any, weight to give Dr. Wilson's opinion.  The ALJ considered  the length of the treatment relationship, frequency of examination, and the nature of the relationship.  Titus visited Dr. Wilson or his colleague at Westshore Family Practice more than ninety  times during 2006.  (Tr. 423-513).

The record contains evidence of Titus' drug-seeking behavior.  Titus' visits to Dr. Wilson's office an average of every four days  supports this suspicion and shadows Dr. Wilson's credibility when obvious evidence of past addiction to marijuana and pain medicine is considered.  (Tr. 212; 396 (positive for marijuana); 217 (admission after suicide attempt of taking five pain pills and half of a "blunt"); 829).  During March 2005, a prior physician, Dr. Vangelos terminated his treatment relationship with Titus stating "I will render only emergency treatment which does not include prescription refills."  (Tr. 314).  Titus informed another physician that she had been terminated from Dr. Vangelos practice due to drug and alcohol abuse.  (Tr. 829).  During January 2005, a different doctor prescribed three refills of Tramadol, but the prescription presented to the  pharmacist requested eight refills.  (Tr. 262).  From the near illegible and

15

(1:11CV01286)

partially incomplete office documentation, the vast majority of Titus's office visits note a chief complaints of "pain shots" and "prescription refills." (Tr. 423-513).

The ALJ considered the supportability of Dr. Wilson's opinion while analyzing both the consistency of the opinion with the record as a whole as well as the specialization of the source and any other factors that would tend to support or contradict the opinion. As Titus's treating physician, Dr. Wilson opined that Titus's limitations were so severe that she could not even perform sedentary work. (Tr. 763-763A). Contrary to Dr. Wilson's opinion, the ALJ concluded Titus retained the RFC to perform a range of sedentary work.[5]

All of the state agency reviewing physicians found that Titus could perform at least some work. (Tr. 219, 220; Tr. 246-52). The ALJ found Dr. Wilson's opinion inconsistent with physical assessment documentation memorializing her numerous office visits. Dr. Wilson noted that Titus was in no acute distress during office examinations, but the doctor inexplicably opined that she was severely restricted. (Tr. 423-513). Titus's daily activities between December 31, 2003, and August 14, 2007, belied Dr. Wilson's opinion and indicated that Titus was more capable than the limitations set by Dr. Wilson. The evidence showed that Titus drove a motorcycle, did housework, occasionally mowed the grass on a riding mower, took care of her pet dog, and traveled to Florida. (Tr. 118, 349, 555, 777). Titus also shopped in stores, played pool, attended pool tournaments, and drove a car. (Tr. 120).

_____

[5] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 416.967(a).

(1:11CV01286)

Dr. Mehrun Elyaderani, M.D. of Orthapedic Associates, INC. diagnosed Titus with mild

osteoarthritis during November 2005 after performing a diagnostic arthroscopy of her left knee.

(Tr. 411, 414).  After performing a physical examination, Dr. Elyaderani noted that there was no

swelling of the knee and that it had  full range of motion recommending  "activities as tolerated"

as well as "no restrictions" during January 2006.  (Tr. 412).

Dr. Wilson, however, diagnosed Titus as having an extreme case of rheumatoid arthritis.

Dr. Wilson is not a rheumatologist. (Tr. 826-27).  *Turley v. Sullivan*, 939 F.2d 524, 527 (8th Cir.

1991) (per curiam) (finding the ALJ was not required to accept the opinion of a treating

physician on a matter that was not within his field of expertise).  The diagnosis of rheumatoid

arthritis had been questioned by a rheumatologist in 2005, and laboratory testing did not yield

serologic objective evidence of the disease. (Tr. 827 (citing Tr. 571-72)).  A rheumatologist

diagnosed  Titus diagnosed with rheumatoid arthritis on August 15, 2007 – the date the ALJ

determined Titus was disabled. (Tr. 152).

The ALJ provided "good reasons" for giving less weight to Dr. Wilson's opinion.  The

ALJ explained Dr. Wilson's opinion was not that of a specialist,  inconsistent with objective

medical evidence, and not supported by the evidence as a whole.  (Tr. 827). "[A] finding that a

treating source medical opinion . . . is inconsistent with the other substantial evidence in the case

record means only that the opinion is not entitled to 'controlling weight,' not that the opinion

should be rejected." Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9, 1996 WL 374188, at *4.

*Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 408 (6th Cir. 2009).

17

(1:11CV01286)

### B. The Vocational Expert's Testimony

#### 1. Legal Authority

If a claimant is unable to perform past relevant work, then in order for the ALJ to conclude the claimant is not disabled, he must identify a significant number of jobs in the economy that fit the claimant's RFC and vocational profile. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The ALJ uses the RFC at Step Five to decide if a claimant can make an adjustment to any other work that may exist in the national economy. 20 C.F.R § 416.945 (a)(5)(ii).

"Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only if the question accurately portrays plaintiff's individual physical and mental impairments." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777 (6th Cir. 1987). "[T]he opportunity to observe the demeanor of a witness, evaluating what is said and in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. Ky. 1986). Furthermore, judicial review of the ALJ's decision must be based on the record as a whole. *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).

#### 2. The ALJ Appropriately Considered the Vocational Expert's Testimony

To satisfy his burden at Step Five, the ALJ relied on a VE to identify occupations that would be available to Titus. Titus argues that the ALJ did not rely upon the VE's complete testimony in reaching his decision. ECF No. 23. The defendant retorts that the ALJ's Step-Five

18

(1:11CV01286)

finding was supported by substantial evidence.  ECF No. 25.  The VE identified several

sedentary occupations that the hypothetical worker with Titus's characteristics could perform.

(Tr. 931).  Upon determining whether the ALJ met the burden of production for Step Five, Titus

and the Report and Recommendation rely upon the following testimony:

> VE: I guess in my experience, employers really generally don't like
> a cane walking on to a production floor.
> ALJ:  Okay.  Does that go to, it seems like that goes to the
> employability rather than to—
> VE:  It goes probably to plac[e]ability
> ALJ: [T]he ability to do the job.
> VE:  Correct.
> ALJ: Could a, so, that question, and I hear what you're saying
> about that, but that, the question of employer preference and, the,
> probably, the employ's insurance preference aside, could this
> hypothetical worker do, I mean, are –
> VE: Yes.
> ALJ:  – there jobs that this hypothetical worker could do?
> VE: Yes.

(Tr. at 930-31).  The VE clarified her testimony by stating that the hypothetical worker could

perform the jobs she identified without any workplace accommodation.  (Tr. 931, 939, 944).  The

magistrate judge concluded that the VE's testimony was in reference to the employability a term

the ALJ used to mean the ability of the hypothetical worker to be placed in a job distinguished

from the ability to do the work in the occupation.

  In her objection, Titus argues that the VE's testimony proves that a worker who required

a cane would neither be able to nor capable of performing jobs identified as suitable for a

hypothetical individual with Titus' RFC.  ECF. No. 23.  Titus argues the magistrate judge

analyzed an incomplete portion of the VE's testimony.  ECF No. 23.  The magistrate judge,

however, analyzed, in detail, the relevant VE testimony. ECF No. 22.  Titus' objection misses the

(1:11CV01286)

point.  In response to the ALJ's  questioning, the VE explained the effect Titus' use of a cane

would have when being considered for job placement as opposed to her ability to perform the

job.  The VE testified that, even with the cane, there are jobs a hypothetical worker matching

Titus'profile can perform.  The record makes this clear.   The ALJ nor the magistrate judge

committed error.

## C.  Significant Numbers Requirement

### 1.  Legal Authority

It is a general rule of administrative law that a reviewing court, "in dealing with a

determination or judgment which an administrative agency alone is authorized to make, must

judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds

are inadequate or improper, the court is powerless to affirm the administrative action by

substituting." *SEC v. Chenery Corp*., 332 US 194 (1947).  When reviewing a magistrate judge's

report and recommendation, "[a] [district court] judge . . . shall make a *de novo* determination of

those portions of the report or specified proposed findings or recommendations to which

objection is made."  28 U.S.C. § 636(b)(1)(c).

The "significant numbers requirement was included in the Act to prevent the denial of

benefits when the evidence establishes nothing more than the theoretical existence of a minimal

number of isolated jobs." *Hall v. Bowen*  837 f.2d 272, 275.  The search encompasses "work

which exists in the national economy, regardless of whether such work exists in the immediate

area in which he lives."  42 U.S.C. 423(d)(2)(A).  "[W]ork which exists in the national economy"

means work which exists in significant numbers either in the region where such individual lives

(1:11CV01286)

or in several regions of the country. 42 USC 423 d2A; 20 CFR Part 404.1566.  If there are types

of work the claimant is able to perform existing in significant numbers in several regions of the

country, the requirement is satisfied.

### 2.  Significant Number of Jobs in the National Economy Were Available to Titus

The  VE's testimony provided the ALJ with several jobs the hypothetical worker with

Titus's characteristics would be able to perform satisfactorily.  (Tr. 932).  The number of jobs

provided are conservative estimates based on a database accessible to the VE and her experience.

(Tr. 938).  The table below summarizes the data provided by the VE:

| Job Title | Northeast Ohio | Ohio | United States |
|-----------|----------------|------|---------------|
| Final Assembler | 250 | 1,800 | 28,000 |
| Stem Mounter | 500 | 1,000 | 26,000 |
| Cashier | 2,800 | 8,400 | 200,700 |

(Tr. 832).  Substantial evidence support does not support the ALJ's finding that Titus could

perform a specific numbers of cashier jobs given her need for a cane, but in accord with the

recommendation of the magistrate judge, the occupation of cashier was not relied upon as part of

the group of occupations used to satisfy the requirements of Step Five.  ECF No. 22 at 22.  The

magistrate judge explained:

> Finally, Titus contends that the VE's testimony with regard to the cashier position
> cannot be accepted as evidence because the VE testified that she did not know how
> many cashier jobs were available to a person with a cane. On cross-examination,
> Titus's attorney questioned the VE about her testimony regarding Titus's need to use
> a cane. Tr. 938. The VE acknowledged that using a cane might be an impediment in
> some cashier jobs because the individual might be required to carry a cash box or

(1:11CV01286)

> cash drawer with two hands. Tr. 944. The VE did not know how many cashier jobs
> would be ruled out as a result of the use of a cane. Tr. 940. Because of this
> uncertainty with regard to the actual number of cashier jobs that could be performed
> with a cane, there is not substantial evidence that a significant number of cashier jobs
> existed in the national economy that Titus could actually perform. As a result, the
> ALJ should not have considered the job of cashier in making his determination under
> Step Five.

. ECF No. 22 at 22.

Excluding the occupation of cashier, the record indicates that there remain 750 jobs in Northeast Ohio, 2,800 jobs in Ohio, and 54,000 jobs in the country that Titus could perform.  (Tr. 931-32).  Titus resides in Elyria, Ohio.  (Tr. 817).  These jobs are not isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where the claimant lives. 20 C.F.R § 414.966(b).  Titus objects to the magistrate judge's recommendation that the Court should accept the occupations of final assembler and stem mounter as satisfying the significant numbers requirement.  Titus asserts these two occupations do not have a sufficient number of jobs available to Titus in her region.

Titus's objection advances a moot distinction among regional, statewide, and national jobs that Titus could have performed in the national economy, excluding the cashier position.  It is not necessary for the Court to distinguish between Northeast Ohio and the entire State of Ohio for purposes of considering potential jobs to determine whether the Commissioner has met his Step Five burden.  "Congress, tightening the definition of disability, eliminated consideration of travel difficulties when those difficulties were extrinsic to the claimed disability; the length and expense of commuting and the resulting inconveniences were no longer to influence a disability determination." *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999).

(1:11CV01286)

Because the ALJ did not find 54,000 national jobs alone were significant does not preclude this court from finding that the number is acceptable.  *See Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988).  The VE provided testimony and other evidence in the record cited by the ALJ; additionally, the  regional and Ohio jobs are included in the 54,000 jobs nationwide.  Thus, substantial evidence exists to support the conclusion that there are a significant number of jobs in the national economy available to Titus.  *See Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs in region, 1,600 in state, and 80,000 nationally was significant number); *McCallister v. Barnhart*, 2004 WL 1918724, *5 (D. Me. Aug. 26, 2004) (372 jobs in Maine and 50,955 nationally was significant number); *Dawson v. Comm'r of Soc. Sec*., No. 11-3258, 2012 U.S. App. LEXIS 5400 at 9 (6th Cir. Ohio March 13 2012).  (19,000 jobs satisfies the Commissioner's burden that a significant number of jobs were available to the claimant.)

### D.  Titus's Untimely Objections to the Report and Recommendation

A district judge may direct a magistrate judge to consider and submit a recommendation on dispositive motions.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a)-(b).  The parties, thereafter, have fourteen (14) days from service to file objections to the magistrate judge's recommendation.  *Id*.  The Court notes that Titus's filed her objections untimely.   While the Court may, for good cause, extend the time for filing objections when a party fails to act due to excusable neglect.  See Fed. R. Civ. P. 6(b)(1)(B).  The Court does not reach the issue of whether excusable neglect has been shown because Titus's objections lack merit.  *See Williams v. Comm'r of Soc. Sec*., No. 10-11629 (E.D. Mich. June 10, 2011).  Counsel is, however, warned that a future failure to timely submit even worthwhile objections will be treated severely.

(1:11CV01286)

### IV.  Conclusion

For the foregoing reasons, the Court affirms the Commissioner of Social Security's

decision denying Titus's application for benefits.  The Report and Recommendation (ECF No.

22) is adopted.


IT IS SO ORDERED.


  July 31, 2012                                   /s/ Benita Y. Pearson

Date                                         Benita Y. Pearson

                                             United States District Judge